**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SHIETA BLACK and CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, Derivatively on Behalf of JELD-WEN HOLDING, INC., | Case No. |
| Plaintiffs, | |
| v. | |
| GARY S. MICHEL, MATTHEW D. ROSS, RODERICK C. WENDT, ANTHONY MUNK, STEVEN E. WYNNE, BRUCE M. TATEN, SUZANNE L. STEFANY, WILLIAM F. BANHOLZER, GREGORY G. MAXWELL, MARK A. BECK, KIRK S. HACHIGIAN, L. BROOKS MALLARD, PATRICK TOLBERT, MARTHA S. BYORUM, and ONEX CORPORATION, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| -and- | |
| JELD-WEN HOLDINGS, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT**

Plaintiffs, by their attorneys, submit this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment. Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs, which are based on personal knowledge. This complaint is also based on the investigation of plaintiffs' counsel, which included, among other things, a review of documents provided to plaintiffs for inspection in response to their inspection demands pursuant to 8 *Del. C.* §220, a review of public filings with

the U.S. Securities and Exchange Commission ("SEC"), a review of court documents filed in antitrust litigations in the U.S. District Court for the Eastern District of Virginia, including *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 and the U.S. Court of Appeals for the Fourth Circuit, *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 19-1397, and a review of news reports, press releases, and other publicly available sources.

## I. NATURE AND SUMMARY OF THE ACTION

1. Maximizing the value of a corporation's business model is both good business and within the scope of permissible fiduciary decision-making. However, when a company faces constant regulatory scrutiny for antitrust violations because of its near-monopolistic power, that company's board of directors has a clear and unavoidable fiduciary obligation to: (i) adopt and implement reasonable internal controls and reporting structures so they can monitor the company's legal compliance; and (ii) oversee that control system and respond to indicia that management is engaging in unlawful misconduct that can hurt the business (such as antitrust violations).

2. This stockholder derivative action on behalf of nominal defendant JELD-WEN Holding, Inc. ("JELD-WEN" or the "Company") would present compelling facts even if it merely involved a board of directors that failed to implement a reasonable legal compliance reporting structure and then ignored repeated adverse litigation findings, resulting in a rare injunction unwinding a prior corporate acquisition, as well as a trebled civil penalties award.

3. This action, however, presents two circumstances that make it uniquely compelling, and not remotely dismissible: (i) a private equity fund, Onex Corporation ("Onex"), who owed fiduciary duties by virtue of being the Company's controlling stockholder had a motive to cause the Company to abuse its monopolistic position in order to maximize the price at which the fund could sell down its massive controlling stake in a large number of open market transactions; and

(ii) ***over $1.7 billion in stock sales*** by that controller during the period before the market learned that industry-leading growth rested not on legal business practices but on unlawful monopolistic behavior. Onex is a defendant in this case.

4. As detailed below, JELD-WEN's Board of Directors (the "Board") oversaw unlawful sales practices and abdicated their fiduciary duties in service of the self-interest of the Company's controlling stockholder, Onex, during the critical time period.

5. As a result of the sustained antitrust law violations giving rise to this stockholder derivative action, JELD-WEN has suffered a rare affirmative injunction, as well as hundreds of millions of dollars in damages to JELD-WEN's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed JELD-WEN to hundreds of millions of dollars in ongoing costs and potential liability for violations of state and federal securities and other laws, while Onex owes the Company money for its massive inside trading scheme.

* * * * * *

6. JELD-WEN designs, produces, and distributes doors, windows, and other related products. Most doors used in homes in the United States are interior "molded doors," which are made by placing a wooden frame and a hollow or solid core between two composite "doorskins" (the front and back of the finished door). Doorskins account for 70% of the total cost of manufacturing interior molded doors. JELD-WEN makes doorskins, which it uses in its own doors and sells to independent manufacturers.

7. The market for interior molded doors and doorskins has been and continues to be highly concentrated. Indeed, before 2012, there were three suppliers of interior molded doorskins in the United States—JELD-WEN, Masonite Corporation ("Masonite"), and CraftMaster

Manufacturing, Inc. ("CMI"). JELD-WEN and Masonite, together, controlled 85% of the interior molded door market.

8. This action arises from JELD-WEN's nearly decade-long unlawful antitrust conspiracy involving the interior molded door and doorskins market. This scheme included, among other things, conspiring to raise the price of interior molded doors and doorskins in North America and eliminate competition. Until recently, the Company's scheme has worked, and JELD-WEN reported significant financial growth and success. Indeed, the Individual Defendants (as identified herein) inflated the Company's stock price by publicly, repeatedly, and falsely attributing the Company's success to its purportedly legitimate pricing strategies and favorable pricing, while claiming the Company operated in a "highly competitive business environment."

9. JELD-WEN began its conspiracy in 2012, with its pursuit of acquiring CMI. The Company sought to gain ownership of CMI's doorskins manufacturing facility in Towanda, Pennsylvania, and to remove CMI as the third major competitor in the market for interior molded doors. JELD-WEN's main competitor, Masonite, had previously tried to acquire this Towanda facility, but the U.S. Department of Justice ("DOJ") blocked the acquisition due to antitrust concerns. As a result of the DOJ's objection, the Towanda facility became a third stand-alone competitor, CMI.

10. When JELD-WEN attempted to acquire CMI in 2012, the antitrust concerns were self-evident. JELD-WEN decided to undermine the regulators by entering into long-term doorskin supply agreements with independent door manufacturers, attempting to deceive the DOJ that the market for doorskins would remain competitive despite the proposed consolidation with CMI. When, as per JELD-WEN's design, the DOJ received no objections from JELD-WEN's customers, the DOJ permitted the Company to acquire CMI. The merger closed on October 24, 2012, leaving

only two dominant door manufacturers to control the market for interior molded doors and doorskins—JELD-WEN and Masonite.

11. After the merger, JELD-WEN and Masonite immediately conspired to raise the price of doorskins and interior molded doors. Beginning in late 2012, JELD-WEN began unilaterally imposing price increases on interior molded doors and doorskins, breaching the express provisions of its long-term supply agreements with independent door manufacturers. Shortly thereafter, Masonite abruptly announced it would stop selling doorskins to independent door manufacturers, leaving JELD-WEN as the sole supplier of doorskins to the market.

12. [redacted] However, defendant Onex was determined to monetize its position, and preferred to use its controlling position to let the Company inflate its stock price while Onex sold over $1.7 billion worth of its stock.

13. The Company's unilateral doorskin price increases understandably raised the ire of independent door manufacturers who had just signed long-term fixed price sales contracts, including, most notably, Steves and Sons, Inc. ("Steves"). In 2016, Steves sued JELD-WEN in the U.S. District Court for the Eastern District of Virginia, alleging that JELD-WEN violated federal antitrust law and breached its contract with Steves, and seeking a divestiture of the Towanda, Pennsylvania, doorskins plant that the Company acquired through the CMI merger. [redacted]

14. In 2018, a jury sided with Steves, finding JELD-WEN liable for violating Section 7 of the Clayton Act and for breach of contract. The jury awarded Steves $12 million in past damages, plus $46.6 million in lost future profits, which was then automatically trebled for a total damage award of $175.8 million. The jury also found that JELD-WEN had breached the supply agreement, ordering the Company to pay almost $10 million in damages for breach of contract.

15. Instead of doing their jobs at this point, the Board allowed JELD-WEN to continue its illegal business practices. Indeed, on November 19, 2019, the court entered a $7 million judgment against the Company for continuing to overcharge Steves for doorskins. The wrongful conduct continued, prompting Steves to seek further relief from the Eastern District of Virginia court as recently as February 2020. Again, JELD-WEN lost, with the court granting an injunction forcing the Company to abide by its supply agreement with Steves.

16. The Steves litigation was not the only lawsuit to arise from the Company's anticompetitive conduct. JELD-WEN has been named as a defendant in several antitrust class action lawsuits filed on behalf of direct and indirect purchasers. The Company has since entered settlement agreements to resolve those actions, agreeing to pay $38 million.

17. JELD-WEN was able to continue its unlawful scheme for so many years because the Individual Defendants concealed their antitrust law violations, falsely attributing JELD-WEN's financial growth and market success to its pricing strategy and quality products. They characterized the interior molded door market as competitive while secretly engaging in an anticompetitive conspiracy.

18. JELD-WEN was forced to partially admit its anticompetitive wrongdoing on October 15, 2018, when the Company issued a press release admitting for the first time that it would likely face a significant judgment in the Steves litigation. The press release announced a

charge of $76.5 million for a "litigation contingency" relating to the Steves litigation, as the recent rulings "now provided sufficient detail for the [C]ompany to estimate future liabilities[.]"

19. On this news, JELD-WEN's market capitalization plunged 18.9%, or $4.03 per share, on October 16, 2018, to close at $17.28 per share compared to the previous trading day's closing of $21.31 per share, erasing $422.8 million in market capitalization in a single day.

20. Investors filed a securities fraud class action soon after in the U.S. District Court for the Eastern District of Virginia on behalf of those that acquired JELD-WEN securities at inflated prices. On October 26, 2020, U.S. District Judge John A. Gibney, Jr. denied the defendants' motion to dismiss the securities class action in its entirety. On March 29, 2021, Judge Gibney granted the plaintiffs' motion for class certification, significantly increasing the Company's exposure. That action has now settled for $40 million.

21. [redacted]

22. [redacted]

23. While the Company was harmed by the Individual Defendants' wrongful conduct, certain insider defendants fared much better. In particular, defendants Kirk S. Hachigian ("Hachigian") and Onex, which was the Company's largest stockholder and controlling stockholder in 2017 and 2018 until the sales at issue here, sold JELD-WEN stock at artificially inflated prices based on their knowledge of material, nonpublic information. The Board's failure to ensure the Company's legal compliance allowed these insiders to dispose of ***more than $1.76 billion*** worth of their personally held JELD-WEN stock.

24. This Action seeks to hold the Board accountable for permitting such sustained corporate disregard for antitrust laws that JELD-WEN has and is suffering massive harm, and seeks all available equitable and monetary relief from Onex and other defendants that violated their fiduciary duties in service of their personal interests.

## II. JURISDICTION AND VENUE

25. Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

26. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

27. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) JELD-WEN is incorporated in this District; and (ii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

28. In addition, the defendants waived, in writing, the Company's exclusive forum provision and agreed to this jurisdiction.

## III. THE PARTIES

### A. Plaintiffs

29. Plaintiff Shieta Black ("Black") was a stockholder of JELD-WEN at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current JELD-WEN stockholder. Plaintiff Black is a citizen of California.

30. Plaintiff the Board of Trustees of the City of Miami General Employees' & Sanitation Employees' Retirement Trust was a stockholder of JELD-WEN at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current JELD-WEN stockholder. Plaintiff is a citizen of Florida.

### B. Nominal Defendant

31. Nominal defendant JELD-WEN is a Delaware corporation with principal executive offices located at 2645 Silver Crescent Drive, Charlotte, North Carolina. Accordingly, JELD-WEN is a citizen of Delaware and North Carolina. JELD-WEN manufactures and designs interior and exterior doors and windows for residential homes and non-residential buildings. As of December 31, 2020, JELD-WEN had over 23,000 employees.

### C. Individual Defendants

32. Defendant Gary S. Michel ("Michel") is JELD-WEN's President, Chief Executive Officer ("CEO") and a director and has been since June 2018. Defendant Michel is named as a defendant in a related securities class action consolidated complaint which alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Defendant Michel was beholden to defendant Onex and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in an unlawful

anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Michel the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $444,231 | $1,212,500 | $4,967,005 | $1,999,287 | $58,497 | $8,681,520 |

Defendant Michel is a citizen of North Carolina.

33. Defendant Matthew D. Ross ("Ross") is JELD-WEN's Chairman and has been since May 2019 and a director and has been since October 2011. Defendant Ross is defendant Onex's Managing Director and has been since January 2015. Defendant Ross was an Onex senior investment professional from at least December 2014 to January 2015. Defendant Ross was beholden to defendant Onex and/or knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Ross the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Total |
|---|---|---|
| 2018 | $200,000 | $200,000 |
| 2017 | $200,000 | $200,000 |

Defendant Ross is a citizen of New York.

34. Defendant Roderick C. Wendt ("Wendt") is JELD-WEN's Vice Chairman and has been since January 2014 and a director and has been since 1985. Defendant Wendt was JELD-WEN's Executive Chairman from 2011 to March 2013; President and CEO from 1992 to August 2011; and served in various roles of increasing responsibility from 1980 to 2011. Defendant Wendt was beholden to defendant Onex and/or knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Wendt the following compensation as a director:

| Fiscal Year | All Other Compensation | Total |
|---|---|---|
| 2018 | $208,000 | $208,000 |
| 2017 | $208,000 | $208,000 |

Defendant Wendt is a citizen of Oregon.

35. Defendant Anthony Munk ("Munk") is a JELD-WEN director and has been since October 2011. Defendant Munk is defendant Onex's Vice Chairman and the Chair of the Partners' Investment Committee and has been since August 2020. Defendant Munk was defendant Onex's Senior Managing Director from at least June 2016 to August 2020. Defendant Munk was beholden to defendant Onex and/or knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including

JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Munk the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Total |
|---|---|---|
| 2018 | $200,000 | $200,000 |
| 2017 | $200,000 | $200,000 |

Defendant Munk is a citizen of New York.

36. Defendant Steven E. Wynne ("Wynne") is a JELD-WEN director and has been since March 2012. Defendant Wynne is a member of JELD-WEN's Audit Committee and has been since at least March 2017. Defendant Wynne was beholden to defendant Onex and/or knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Wynne the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $90,000 | $110,000 | $200,000 |
| 2017 | $90,000 | $110,000 | $200,000 |

Defendant Wynne is a citizen of Oregon.

37. Defendant Bruce M. Taten ("Taten") is a JELD-WEN director and has been since April 2014. Defendant Taten was beholden to defendant Onex and/or knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing

strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Taten the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2018 | $103,500 | $110,000 | $213,500 |
| 2017 | $90,000 | $110,000 | $200,000 |

Defendant Taten is a citizen of Texas.

38. Defendant Suzanne L. Stefany ("Stefany") is a JELD-WEN director and has been since October 2017. Defendant Stefany was a member of JELD-WEN's Audit Committee from at least April 2018 to April 2019. Defendant Stefany knowingly, in bad faith, or in conscious disregard for her duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Stefany the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2018 | $90,000 | $110,000 | $200,000 |
| 2017 | $22,500 | $44,000 | $66,500 |

Defendant Stefany is a citizen of Massachusetts.

39. Defendant William F. Banholzer ("Banholzer") is a JELD-WEN director and has been since August 2017. Defendant Banholzer knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product

quality, and anticompetitive conduct. JELD-WEN paid defendant Banholzer the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $90,000 | $110,000 | $200,000 |
| 2017 | $45,000 | $66,000 | $111,000 |

Defendant Banholzer is a citizen of Wisconsin.

40. Defendant Gregory G. Maxwell ("Maxwell") is a JELD-WEN director and has been since February 2017. Defendant Maxwell is Chair of JELD-WEN's Audit Committee and has been since at least March 2017. Defendant Maxwell knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Maxwell the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $115,000 | $110,000 | $225,000 |
| 2017 | $115,000 | $110,000 | $225,000 |

Defendant Maxwell is a citizen of Texas.

41. Defendant Mark A. Beck ("Beck") was JELD-WEN's CEO and President from November 2015 to February 2018 and a director from May 2016 to February 2018. Defendant Beck is named as a defendant in a related securities class action consolidated complaint which alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Defendant Beck was beholden to Onex and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in an unlawful anticompetitive scheme designed to

increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Beck the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $141,346 | - | - | - | $2,005,728 | $2,147,074 |
| 2017 | $870,192 | $1,572,768 | $2,242,439 | $400,000 | $532,149 | $5,617,548 |

Defendant Beck is a citizen of North Carolina.

42. Defendant Hachigian was JELD-WEN's Chairman of the Board from December 2016 to May 2019 and a director from September 2013 to May 2019. Defendant Hachigian was JELD-WEN's interim CEO from February 2018 to June 2018; Executive Chairman from November 2015 to December 2016; and CEO and President from March 2014 to November 2015. Defendant Hachigian is named as a defendant in a related securities class action consolidated complaint which alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Defendant Hachigian was beholden to Onex and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and made improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. While in possession of material, nonpublic information concerning JELD-WEN's true business health, defendant Hachigian sold 454,404 shares of his personally held JELD-WEN stock for $13,961,175.71 in proceeds. JELD-WEN paid defendant Hachigian the following compensation as an executive:

| Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2018 | $10,109,971 | $874,615 | $10,984,586 |
| 2017 | $110,000 | $190,000 | $300,000 |

Defendant Hachigian is a citizen of Texas.

43. Defendant L. Brooks Mallard ("Mallard") was JELD-WEN's Executive Vice President and Chief Financial Officer ("CFO") from November 2014 to November 2018. Defendant Mallard is named as a defendant in a related securities class action consolidated complaint which alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Defendant Mallard was beholden to Onex and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and made improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Mallard the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $452,481 | $867,453 | $300,044 | - | $286,979 | $1,906,957 |
| 2017 | $496,346 | $428,418 | $610,828 | $285,000 | $10,800 | $1,831,392 |

Defendant Mallard is a citizen of Michigan.

44. Defendant Patrick Tolbert ("Tolbert") was a JELD-WEN director from November 2011 to April 2018. Defendant Tolbert was a member of JELD-WEN's Audit Committee in at least March 2017. Defendant Tolbert knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's

press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Tolbert the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $45,000 | - | $45,000 |
| 2017 | $90,000 | $110,000 | $200,000 |

Defendant Tolbert is a citizen of Pennsylvania.

45. Defendant Martha S. Byorum ("Byorum") was a JELD-WEN director from July 2014 to April 2021. Defendant Byorum was a member of JELD-WEN's Audit Committee from at least March 2017 to at least April 2021. Defendant Byorum knowingly, in bad faith, or in conscious disregard for her duties caused or allowed the Company to engage in an unlawful anticompetitive scheme designed to increase profits and eliminate competition, and make improper statements in JELD-WEN's press releases and public filings concerning the Company's business operations and financial success, including JELD-WEN's competitive environment, pricing strategy, product quality, and anticompetitive conduct. JELD-WEN paid defendant Byorum the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $101,250 | $110,000 | $211,250 |
| 2017 | $90,000 | $110,000 | $200,000 |

Defendant Byorum is a citizen of New York.

**D. Controlling Stockholder Defendant**

46. Defendant Onex is a Toronto, Canada-based investment firm that manages and invests capital. Defendant Onex is JELD-WEN's largest stockholder and has been since October 2011. As of September 24, 2016, defendant Onex owned approximately 84% of JELD-WEN common stock on an as-converted basis. As of March 1, 2021, defendant Onex beneficially owned

32,101,820 shares of JELD-WEN common stock or 31.9% of JELD-WEN. Defendant Onex is named as a defendant in a related securities class action consolidated complaint which alleges it violated section 20(a) of the Exchange Act. While in possession of material, nonpublic information concerning JELD-WEN's true business health, defendant Onex sold 57,014,784 shares of its personally held JELD-WEN stock for proceeds of $1,746,671,635.47. Defendant Onex is a citizen of Canada.

47. The defendants identified in ¶¶32, 41-43 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶32-42, 44-45 are referred to herein as the "Director Defendants." The defendants identified in ¶¶36, 38-40, 44-45 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶42, 46 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶32-45 are referred to herein as the "Individual Defendants."

## IV. THE BOOKS AND RECORDS DEMANDS

48. Pursuant to 8 *Del. C.* §220, plaintiff Black made her initial demand to inspect JELD-WEN's Board books and records on November 3, 2020. In her correspondence, plaintiff Black demanded to inspect Board-level documents concerning, among other things: the Company's merger with CMI; compliance with antitrust laws; communications with antitrust regulators; pricing increases; Masonite's pricing increases and decision to cease the sale of doorskins to independent door manufacturers; the antitrust class action lawsuit settlements; the Steves litigation; any review or approval of improper statements concerning the unlawful conduct described herein; the court-ordered divestiture of CMI; the Company's doorskins product quality issues; and its reimbursement policy for defective doorskins. After meeting and conferring multiple times, the Company agreed to produce:

1. The Board books and records, including any minutes, resolutions, reports, presentations, or memoranda made, reviewed by, or provided to the Board, concerning:

   a. the Company's decision to purchase CMI, including, but not limited to, any review of the antitrust laws in connections with the CMI acquisition;

   b. the Company's decision to hire Orsino, Maughon, and Merrill, who had previously held senior executive positions as Masonite or CMI;

   c. the Company's compliance with antitrust laws in the United States;

   d. review or approval of price increases of interior molded doors and doorskins for independent door manufacturers, direct consumers and indirect consumers;

   e. Masonite[]'s price increases of interior molded doors;

   f. Masonite[]'s decision to cease the sale of doorskins to independent interior molded door manufacturers;

   g. communications with government agencies, including, but not limited to, the DOJ, regarding the Company's anticompetitive behavior in the interior molded door market;

   h. the settlements between the Company and the two class action lawsuits on behalf of direct and indirect purchasers of interior molded doors;

   i. review or approval of the statements contained in: (i) the Company's IPO offering statements from January 26, 2017; (ii) Jeld-Wen's earnings calls for the fourth quarter of 2016, first quarter of 2017, fourth quarter of 2017, and first quarter of 2018; (iii) the Company's RBC Capital Markets Global Industrials Conference on September 14, 2017; (iv) the Robert W. Baird Global Industrial Conference on November 8, 2017; (v) Jeld-Wen's Annual Report for 2017; and (vi) Quarterly Reports for the first and second quarters of 2018; and

   j. the Court ordered divestiture of CMI.

49. Plaintiff Black also demanded, and the Company agreed, to produce Board books and records concerning:

(a) any review of any "quality issues with JELD-WEN's doorskins," including, without limitation, any customer complaints concerning the quality of doorskins

(*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 2021 WL 630521, at *3); and (b) the Company's reimbursement policy for defective doorskins.

50. After several discussions with counsel for JELD-WEN concerning the scope of plaintiff Black's inspection demand, the parties negotiated a time period from 2014 to 2018. In addition, the parties extended the time period to 2020 to produce: i) "Board books and records related to Judge Payne's April 2020 preliminary injunction decision"; ii) "[w]ith respect to the Board committees, . . . relevant, non-privileged documents from the Audit Committee; and iii) "relevant, non-privileged documents from the Governance and Nominating Committee to the extent the documents relate to compliance of the Company's antitrust policy expressed in its Code of Business Conduct and Ethics."

51. [redacted] The Director Defendants were, at all relevant times, well aware of the stringent laws and government regulation over antitrust compliance, and unheeded the very responsibilities that JELD-WEN's own Code of Business Conduct and Ethics (the "Code") imposed on them.

52. Specifically, each of the Individual Defendants committed to conduct the Company's business in compliance with all applicable laws, rules, and regulations. As the Code provides, "[b]usiness activities must be conducted in accordance with applicable antitrust and competition laws. Some of the most serious antitrust offenses are agreements between competitors that limit independent judgment and restrain trade, such as agreements to fix pricing, or to divide a market for customers, territories, products or purchases."

53. Notwithstanding the Code's provisions, the Director Defendants knew of the duties imposed on them but have continuously failed to act, resulting in JELD-WEN's unfair financial growth gained from its unlawful anticompetitive scheme.

## V. FACTUAL BACKGROUND

### A. JELD-WEN's Business and Controlled Status During the Relevant Time Period

54. JELD-WEN designs, produces, and distributes doors, windows, and related products. JELD-WEN's customer base consists of wholesale distributors, retailers, and individual consumers. The Company operates 140 manufacturing and distribution facilities in 19 countries, including North America, and controls vertically integrated[1] manufacturing processes for many of its products.

55. Most doors used in homes in the United States are interior "molded doors," which are made by sandwiching a wooden frame and a hollow or solid core between two composite "doorskins" (the front and back of the finished door). Doorskins are formed from a fibrous material, such as wood chips or sawdust, which is then softened in a digester, refined with wax and resin, and then formed into a mat. The mat is cut into sheets and then loaded into a hot press. After coming off the press, the resulting doorskins are sized, trimmed, primed or painted, packed, and shipped to an interior molded door manufacturer.

56. Doorskins are a key component of interior molded doors, accounting for 70% of the total cost of manufacturing interior molded doors. JELD-WEN makes doorskins, which it uses in its own doors or otherwise sells to independent manufacturers.

57. In 2011, with JELD-WEN facing bankruptcy due to the economic recession, defendant Onex acquired a 58% stake in the Company. Upon acquisition, defendants Ross and Munk—each executives of defendant Onex—became directors of the Company.

---

[1] Vertical integration refers to the process of controlling all business operations and processes within the supply chain. A company that opts for vertical integration takes complete control over one or more stages in the production or distribution of a product.

58. By JELD-WEN's initial public offering ("IPO") in January 2017, defendant Onex controlled over 83.8% of JELD-WEN's stock. Defendant Onex remained the Company's controlling stockholder until it sold down its JELD-WEN shares beginning in May 2017, while the Company's stock price was artificially inflated. Between 2011 and 2017, during its control over the Company, defendant Onex elected defendants Ross, Munk, Wynne, Taten, Stefany, Banholzer, Beck, Hachigian, Tolbert, and Byorum to the Board.

**B. JELD-WEN Enjoys Near Monopolistic Market Power, Bringing the Opportunity to Profit, Coupled with Constant Antitrust Scrutiny**

59. Before 2012, there were three suppliers of interior molded doorskins in the United States—JELD-WEN, Masonite, and the much smaller, CMI. JELD-WEN and Masonite, together, controlled 85% of the interior molded door market.

60. Masonite was a wholly owned subsidiary of International Paper Company. In 2000, International Paper Company announced its intention to sell Masonite to Premdor, Inc. ("Premdor"), the largest manufacturer of interior molded doors at that time.

61. Premdor, like JELD-WEN, was a vertically integrated interior molded door manufacturer. Premdor owned two doorskins plants in the United States – one in Towanda, Pennsylvania and one in Laurel, Mississippi.

62. In 2001, the DOJ filed a civil antitrust lawsuit seeking to block Premdor's acquisition of Masonite. The DOJ alleged that the merger would violate Section 7 of the Clayton Act. *See United States v. Premdor, et al.*, No. 1:01-CV-01696 (D.D.C.).

63. As alleged by the DOJ, permitting Premdor to procure Masonite and its doorskins business would remove the third supplier of doorskins and leave just two vertically-integrated door manufacturers. This practice would harm competition in the market for interior molded doors by creating incentives for the dominant suppliers to limit the supply of doorskins. The proposed

merger would "tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers."

64. The DOJ added that the merger would create an incentive for Masonite/Premdor to coordinate with the already vertically-integrated JELD-WEN. In particular, the DOJ stated:

> Documentary evidence obtained from the defendants suggests that the non-party firm [JELD-WEN], as a fully vertically integrated manufacturer, has certain cost advantages over Masonite and Premdor that it has used to lower prices to build market share. This differing cost structure among the dominant firms is an impediment to coordination. The evidence from the defendants suggests that post-acquisition, the cost structures of the two vertically integrated firms would be more closely aligned, decreasing the opportunity for the non-party firm [JELD-WEN] to increase its market share profitably through lower prices, and thus increasing the non-party firm's incentive to coordinate with the combined Premdor/Masonite. In fact, Masonite recognized that the non-party firm's [JELD-WEN'S] incentive to gain market share by lowering price would diminish if it faced a strong, integrated competitor.

65. When it filed suit, the United States also filed a proposed final judgment that would permit the Masonite/Premdor merger to take place on the condition that the Towanda, Pennsylvania, doorskins plant was divested from Masonite and spun off to an acceptable buyer. In April 2002, the judgment became final, including the divestiture provision. On this conditional approval, Premdor acquired Masonite and operated the combined businesses under the name "Masonite," while the Towanda plant was sold to CMI.

66. Consistent with the DOJ's stated purpose for the divestiture of maintaining competition in the U.S. interior molded door market, CMI became the third major competitor in the doorskins market, along with JELD-WEN and Masonite.

## VI. JELD-WEN ENGAGES IN AN ANTICOMPETITIVE SCHEME

### A. JELD-WEN Pursues an Acquisition of CMI to Dominate the Doorskins Market

67. In or around early 2012, JELD-WEN actively sought to purchase CMI, including the Towanda, Pennsylvania, plant.

68. JELD-WEN's officers and directors recognized that such an acquisition would implicate antitrust concerns. To limit or avoid DOJ scrutiny, JELD-WEN entered into long-term supply agreements with independent door manufacturers for the sale of doorskins. By entering into the supply agreements, the Company created the impression to the DOJ that third parties would still get their supply of doorskins at competitive prices, and therefore, there would be continued competition in the doorskins market.

69. Specifically, by executing what were typically seven-year supply contracts, JELD-WEN caused counterparties to not challenge the deal, and convinced the DOJ that JELD-WEN would not be able to abuse its power based solely on market scale. As explained below, almost immediately after entering into these agreements, JELD-WEN looked for ways around them.

70. One of those long-term doorskins supply contracts was executed on May 1, 2012, with Steves, an independent door manufacturer (the "Supply Agreement"). At this time, Steves' only other real options to purchase doorskins were Masonite and CMI.

71. Under the Supply Agreement, Steves agreed to purchase at least 80% of its doorskins products from JELD-WEN from January 1, 2012 until December 31, 2019, with automatic renewals of seven-year terms unless either party terminated the contract.

72. Pursuant to the Supply Agreement, JELD-WEN would charge Steves prices that varied annually according to a contractually-defined formula based on JELD-WEN's input costs. The Supply Agreement required JELD-WEN to give Steves annual notice of the prices and input costs for the coming year, and JELD-WEN could not impose any price increases if it failed to provide such notice.

73. Notably, JELD-WEN approached the DOJ about approving the CMI deal only after it had entered into the long-term supply agreements with the independent door manufacturers,

including the Supply Agreement summarized above. As U.S. District Judge Robert E. Payne for the Eastern District of Virginia would later explain, JELD-WEN engaged in this "oft-used tactic" in order to "assuage the concerns of the DOJ and the [independent door manufacturers] about [the] anticompetitive effects of the proposed [transaction]." Indeed, the Company considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, as JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go." Thus, when the DOJ reached out to independent door manufacturers when it learned of the proposed merger, those manufacturers responded that they did not oppose the merger.

74. On or around June 18, 2012—six weeks after executing the Supply Agreement—JELD-WEN publicly announced its intent to acquire CMI.

75. The CMI merger closed on October 24, 2012. As a result, JELD-WEN and Masonite now controlled 85% of the market for interior molded doors. Compounding that market dominance, the manufacturers comprising the other 15% of the interior molded doors market, including Steves, were not vertically integrated and had no choice but to purchase doorskins from either JELD-WEN or Masonite.

**B. Steves Immediately Encounters Issues with JELD-WEN**

76. With competitive pressures eliminated, JELD-WEN had less incentive to provide good customer service or compete with other suppliers on price. Instead, JELD-WEN had strong economic incentives to try and either break out of the long-term contracts or provide the barest minimum possible under them. Moreover, defendant Onex, as JELD-WEN's controlling stockholder, had its own motive to internalize as much as possible from any abuse of the Company's market power.

77. Steves had issues with JELD-WEN almost immediately after signing the Supply Agreement. Starting in mid-2012, Steves noticed quality issues with JELD-WEN's doorskins. This was apparently a widespread problem. As the Fourth Circuit would later note, "[i]nternal JELD-WEN documents from this time suggest that other [independent door manufacturers] were complaining about its doorskins, too." *Steves & Sons, Inc. v. Jeld-Wen,* Inc., No. 19-1397 (4th Cir. 2021).

78. JELD-WEN also began increasing the prices that it charged Steves, despite the Supply Agreement that only allowed price increases that were tied to the rise in the Company's input costs. To be sure, JELD-WEN's costs had actually declined, which meant that it should have reduced Steves' prices under the Supply Agreement, not raised them. As the Fourth Circuit noted, "JELD-WEN charged Steves almost eight percent more than what the Supply Agreement allowed in [2013-2015].

79. "Other JELD-WEN customers without a supply agreement endured even greater price increases." Moreover, JELD-WEN attempted to add a "capital charge" to the contractual doorskins prices under the Supply Agreement, purportedly to help offset the cost of making capital improvements to the Company's doorskins manufacturing facilities. This capital charge, however, was not permitted under the pricing provisions of the Supply Agreement.

80. JELD-WEN's relationship with Steves deteriorated further after JELD-WEN hired defendant Hachigian in March 2014. In April 2014, defendant Hachigian expressed his views to Steves that the Supply Agreement did not adequately compensate JELD-WEN for its capital improvements to its doorskins facilities. He suggested that JELD-WEN might exercise its seven-year termination option.

81. Still, JELD-WEN's quality issues with its products persisted, and the Company also changed its policy for reimbursements for defective doorskins. Specifically, around this time, JELD-WEN changed its approach to dealing with defective doorskins by significantly limiting reimbursements under the Supply Agreement. Prior to this change, if a customer of Steves rejected a door as defective because of defective doorskins, Steves would give the customer credits for the purchase price of the door, and then seek reimbursement from JELD-WEN for the full cost of the door. JELD-WEN would normally pay the entire amount. JELD-WEN changed that policy in or around late 2014 when it adopted a policy to reimburse Steves only for the defective doorskins, rather than for the full cost of the doors.

82. In January 2015, JELD-WEN again increased prices for Steves for the upcoming year, leading to a contentious meeting between the two parties. In March 2015, Steves triggered the Supply Agreement's dispute resolution procedures. In September 2015, with no negotiated resolution in sight, Steves presented JELD-WEN with a draft complaint that alleged breach of contract and antitrust claims against JELD-WEN. In December 2015, Steves asked the DOJ to reexamine whether the Company's merger with CMI was anticompetitive.

**C. JELD-WEN and Masonite Conspire to Overcharge Door Manufacturers**

83. In or around May 2014, Masonite abruptly stopped selling doorskins to other door manufacturers. At a public presentation, a Masonite executive explained that this was "the right strategic call" and would "make sure that there are some effective barriers to entry within the [interior molded door] space." He also opined that Masonite and JELD-WEN would maintain their doorskins duopoly because of such barriers to entry, and that the continued survival of the independent door manufacturers was "less likely going forward." As the Fourth Circuit explained, the conspirators' goal was to "kill off" the independent door manufacturers.

84. As a result of Masonite's decision, JELD-WEN became the sole supplier of doorskins to independent door manufacturers. As the sole supplier of doorskins, JELD-WEN set out to exploit its market power by engaging in anticompetitive conduct against the independent door manufacturers with which the Company had executed long-term supply agreements, including Steves.

85. Specifically, JELD-WEN departed from its old, high volume/low margin strategy that emphasized growth and increased market share, to a new lower volume/higher margin strategy that emphasized "pricing optimization," designed to increase product profitability on a per unit basis. This "pricing optimization" was really just JELD-WEN unilaterally raising prices it charged to the independent door manufacturers, among other things.

86. According to the Fourth Circuit, internal documents from 2015 and 2016 suggest that JELD-WEN planned to: (i) increase its doorskins prices; (ii) end contracts with customers; and (iii) ultimately stop selling to independent manufacturers altogether over the next few years. JELD-WEN hoped that this would "kill off a few" of the independent door manufacturers and allow it to [i]ncrease [its molded] door market share."

**D.** [redacted]

87. [redacted]

88. The Company had a long history of participating in the highly concentrated market for interior molded doors and even communicating with the DOJ regarding anticompetitive issues within the industry. The Director Defendants were also well aware of the stringent laws and government regulation over antitrust compliance as described in JELD-WEN's Code. Thus, the Director Defendants knew or should have known that a strategy of increasing prices for interior molded doors and not abiding by the terms of its long-term contracts would present antitrust concerns that the Company was not complying with the law, and would therefore place the Company at risk.

89. [redacted]

**E. Steves Files an Antitrust Action Against JELD-WEN**

90. In June 2016, Steves filed an action in the U.S. District Court for the Eastern District of Virginia, alleging JELD-WEN breached its contract with Steves and violated federal antitrust laws under Section 7 of the Clayton Act. The Clayton Act forbids mergers whose effect "may be

substantially to lessen competition," 15 U.S.C. §18, and authorizes treble damages for private plaintiffs who are injured by such mergers, *id.* §15(a).

91. As Steves alleged, the Company's acquisition of CMI was illegal because the effect of the merger substantially reduced competition or tended to create a monopoly in the interior molded doors market. Steves alleged that the lack of competition in the interior molded door industry, and specifically, the fact that JELD-WEN was the only vertically integrated doorskins manufacturer willing to sell to independent door manufacturers, enabled the Company to illegally overcharge for doorskins.

**F.** [redacted]

92. [redacted]

93. In further display of the Board's inadequate internal controls and failure to implement any compliance programs despite severe risks to JELD-WEN, defendants Beck, Hachigian, Wendt, Byorum, Maxwell, Ross, Munk, Taten, Tolbert, and Wynne each signed the Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-

---

[2] All references to "JW-220-_______" are from the Section 220 Documents produced in response to plaintiff Black's inspection demand.

K") filed with the SEC on March 3, 2017, that acknowledged the Steves litigation. In particular, the 2016 Form 10-K stated:

> …[O]n June 29, 2016, the counterparty to the agreement, Steves filed a claim against JWI in the U.S. District Court for the Eastern District of Virginia, Richmond Division. The complaint alleges that our acquisition of CMI, together with subsequent price increases and termination of the contract, violated antitrust laws and constituted a breach of contract, breach of warranty, and tort. The complaint seeks injunctive relief, ordinary and treble damages, and declaratory relief.

94. [redacted]

95. [redacted]

96. [redacted]

[redacted]

97. [redacted]

[redacted]

98. [redacted]

[redacted]

[redacted]

99. [redacted]

[redacted]

[redacted]

100. [redacted]

[redacted]

[redacted]

101. [redacted]

[redacted]

102. [redacted]

[redacted]

[redacted]

103. [redacted]

[redacted]

[redacted]

104. [redacted]

105. [redacted]

[redacted]

106. [redacted]

107. [redacted]

108. [redacted]

109. [redacted]

[redacted]

110. [redacted]

[redacted]

[redacted]

111. [redacted]

**G. The Board Refuses to Take Action to Protect JELD-WEN Even After the Unfavorable Steves Litigation Jury Verdict**

112. On February 15, 2018, the Company announced that an unfavorable jury verdict had been reached in the Steves case. The jury unanimously agreed with Steves that JELD-WEN's acquisition of its former competitor, CMI, violated federal antitrust law by substantially reducing competition in the U.S. market for interior molded doorskins.

113. The jury awarded Steves $12 million in past damages, plus $46.6 million in future lost profits, which was automatically trebled under the antitrust law for a total of $175.8 million. The jury found that JELD-WEN had breached the Supply Agreement, and the Company was ordered to pay almost $10 million in damages for breach of contract.

114. On October 5, 2018, the Eastern District of Virginia court issued a post-trial memorandum opinion, following an evidentiary hearing, which provided the specific detail, as described herein, as to JELD-WEN's misconduct and anticompetitive behavior.

115. The court also issued an extraordinary affirmative injunction, reflecting the seriousness of the evidence against JELD-WEN, and making plain to any and every Board member the imperative of exercising their duties to monitor legal compliance and ensure the Company does not further suffer harm.

116. Pursuant to the court's order, JELD-WEN was to divest CMI (including CMI's doorskins facility in Towanda, Pennsylvania) because the CMI merger substantially reduced competition and allowed JELD-WEN to unfairly increase pricing for its doorskins. The court found divestiture to be in the public interest because it would restore competition to the doorskins market by creating a third supplier.

117. Despite this ruling, JELD-WEN continued to engage in anticompetitive behavior by overcharging Steves for doorskins in the exact same manner as it had before the verdict and

declaratory judgment. Accordingly, Steves moved for further relief from the Eastern District of Virginia court for JELD-WEN's continuing wrongful conduct. On November 19, 2019, the court entered a $7 million judgment against the Company for continuing to overcharge Steves for doorskins.

118. The judgment, however, did not stop the Individual Defendants from continuing their unlawful conduct. On February 14, 2020, Steves filed a new lawsuit against JELD-WEN for ***new*** misconduct. Specifically, Steves alleged that the Company was drastically limiting its supply of doorskins and failing to timely deliver doorskins to Steves in order to damage Steves' business. This practice breached the express provisions of the Supply Agreement, which required JELD-WEN to issue a notice of allocation only in the event of a production shortage, and also required JELD-WEN to fill Steves' orders "within thirty 30 days of receipt of Steves' purchase orders."

119. Steves alleged that JELD-WEN improperly instigated an allocation period by artificially producing a production shortage and refused to deliver doorskins to Steves within the required thirty days in order to harm Steves. The Eastern District of Virginia court granted a preliminary injunction on April 10, 2020, forcing JELD-WEN to supply Steves with doorskins consistent with the Supply Agreement. *See Steves and Sons, Inc. v. JELD-WEN, Inc.*, No. 3:20-CV-98, 2020 WL 1844791 (E.D. Va. Apr. 10, 2020).

120. On April 14, 2020, Steves filed a motion for further supplemental relief for pricing differences from the date of the November 19, 2019 order through the end of the Supply Agreement. The parties entered into a settlement agreement on June 2, 2020 to resolve the future pricing action.

121. In addition, as a result of its anticompetitive behavior, purchasers of interior doorskins sued JELD-WEN in several antitrust class action lawsuits. These lawsuits were

consolidated into two separate actions—one on behalf of indirect purchasers and one on behalf of direct purchasers of interior molded doors, in the U.S. District Court for the Eastern District of Virginia. *See In Re: Interior Molded Doors Indirect Purchaser Antitrust Litigation*, 3:18-cv-00850-JAG (E.D. Va.); *see also In Re: Interior Molded Doors Antitrust Litigation*, 3:18-cv-00718-JAG (E.D. Va.). The first of these actions was filed on February 19, 2020. The plaintiffs alleged that JELD-WEN and Masonite violated Section 1 of the Sherman Act, and related state antitrust and consumer protection laws, by engaging in the scheme to artificially raise, fix, maintain, or stabilize the prices of interior molded doors in the United States. The Company recently settled both class actions. In August and September of 2020, JELD-WEN agreed to settle both cases for $38 million, with $28 million allotted to the class of direct purchasers and $9.75 million to the class of indirect purchasers.

122. On February 18, 2021, the Fourth Circuit Court of Appeals affirmed Judge Payne's decision ordering divestiture of CMI and the Towanda, Pennsylvania, plant. The Fourth Circuit decision included several significant holdings. First, the Fourth Circuit agreed that Steves had suffered antitrust injury—Steves was injured because it lost access to a supply of doorskins as a result of the merger and because the merger reduced competitive pressures for JELD-WEN to provide quality services at competitive prices. Second, the divestiture of CMI was necessary to address the harm to competition and protect Steves and other customers from anticompetitive harm. Third, although Steves waited nearly four years to challenge the CMI merger, the requested divestiture remedy was not time-barred because Steves did not learn about its relevant injury until two years after the CMI merger closed.

## VII. THE INDIVIDUAL DEFENDANTS' FALSE STATEMENTS ALLOW INSIDERS TO SELL OVER $1.7 BILLION WORTH OF JELD-WEN STOCK AT INFLATED PRICES

123. To conceal their wrongdoing and provide the market with inflated financial results, the Individual Defendants disseminated a series of improper statements from January 2017 to October 2018. Specifically, the Individual Defendants: (i) attributed JELD-WEN's financial growth and market success to its pricing strategy and product quality, and not its anticompetitive conduct; (ii) characterized the interior molded door market as competitive while at the same time engaged in an anticompetitive scheme to eliminate competition; and (iii) described the Steves litigation as meritless when it resulted in a $175.8 million verdict for Steves and the divestiture of CMI and the Towanda, Pennsylvania, plant.

124. Indeed, despite their knowledge that the Company achieved its financial success because of its anticompetitive conduct, the Individual Defendants repeatedly claimed that JELD-WEN's success was driven by legitimate strategies such as "pricing optimization," "pricing discipline," "strategic pricing," and "favorable pricing."

125. [redacted]

126. [redacted]

127. Despite their knowledge, the Director Defendants reviewed and approved the false statements issued to the public. These statements, in turn, inflated the Company's stock price. Defendant Onex, the Company's controlling stockholder at the time, and defendant Hachigian, then took advantage of this inflation to unload massive amounts of the personally held JELD-WEN stock.

128. On June 4, 2021, court filings indicate a securities fraud lawsuit, which had survived a motion to dismiss and a challenge to class certification, settled for $40 million ($39.5 million by JELD-WEN and $500 thousand by Onex). There is no reason why the Company should have borne the costs of this lawsuit, which go far beyond the $39.5 million payment. The defendants in this action should indemnify the Company for the full loss and expenses related to the litigation, which arises from the same scheme alleged herein to permit Onex to monetize its position at inflated prices.

## VIII. INSIDER SALES BY DEFENDANTS ONEX AND HACHIGIAN

129. Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of JELD-WEN's material, nonpublic information to sell their personal holdings while JELD-WEN's stock was artificially inflated. As officers, directors, and controlling stockholders of JELD-WEN, defendants Onex and Hachigian were privy to material, nonpublic information about JELD-WEN's true business health.

130. While in possession of this knowledge, defendant Onex sold 57,014,784 shares of its personally held JELD-WEN stock for proceeds of $1,746,671,635.47. Defendant Onex's sales were timed to maximize profit from JELD-WEN's then artificially inflated stock price. Defendant Onex's sales are suspicious given that its stock sales represented 69.93% of its holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 62,788,000 |

| | |
|---|---|
| Shares Sold During Sales Period ("SP") | 57,014,784 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 81,530 |
| Shares Remaining SP | 24,515,505 |
| **Total Proceeds from Sales** | **$1,746,671,635.47** |
| **% of Total Ownership Sold During SP** | **69.93%** |

131. While in possession of this knowledge, defendant Hachigian sold 454,404 shares of his personally held JELD-WEN stock for proceeds of $13,961,175.71. Defendant Hachigian's sales were timed to maximize profit from JELD-WEN's then artificially inflated stock price. Defendant Hachigian's sales are suspicious given that his stock sales represented 23.33% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 1,459,208 |
| Shares Sold During SP | 454,404 |
| Shares Disposed (Other) During SP | 761,914 |
| Total Shares Held During SP | 1,947,597 |
| Shares Remaining SP | 731,279 |
| **Total Proceeds from Sales** | **$13,961,175,371.00** |
| **% of Total Ownership Sold During SP** | **23.33%** |

132. In sum, defendants Onex and Hachigian sold over $1.76 billion worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| ONEX | 2/1/2017 | 6,477,273 | $21.56 | $139,666,199.06 |
| | 5/31/2017 | 8,392,406 | $29.67 | $249,034,577.16 |
| | 5/31/2017 | 1,134,399 | $29.67 | $33,661,929.05 |
| | 5/31/2017 | 22,005 | $29.67 | $652,971.97 |
| | 5/31/2017 | 112,464 | $29.67 | $3,337,234.24 |
| | 5/31/2017 | 107,017 | $29.67 | $3,175,601.05 |
| | 5/31/2017 | 3,136,013 | $29.67 | $93,057,422.56 |
| | 5/31/2017 | 138,854 | $29.67 | $4,120,325.83 |
| | 5/31/2017 | 27,020 | $29.67 | $801,786.08 |
| | 5/31/2017 | 322,961 | $29.67 | $9,583,480.12 |
| | 6/5/2017 | 1,296,541 | $29.67 | $38,473,298.33 |
| | 6/5/2017 | 175,253 | $29.67 | $5,200,422.47 |
| | 6/5/2017 | 34,298 | $29.67 | $1,017,751.99 |
| | 6/5/2017 | 17,374 | $29.67 | $515,552.60 |
| | 6/5/2017 | 16,533 | $29.67 | $490,596.94 |
| | 6/5/2017 | 484,482 | $29.67 | $14,376,421.97 |

| | | | | |
|---|---|---|---|---|
| | 6/5/2017 | 21,451 | $29.67 | $636,532.68 |
| | 6/5/2017 | 4,174 | $29.67 | $123,858.44 |
| | 6/5/2017 | 49,894 | $29.67 | $1,480,544.58 |
| | 11/14/2017 | 10,865,042 | $32.74 | $355,694,312.48 |
| | 11/14/2017 | 481,073 | $32.74 | $15,749,127.34 |
| | 11/14/2017 | 1,118,932 | $32.74 | $36,631,036.35 |
| | 11/14/2017 | 7,586,315 | $32.74 | $248,356,987.31 |
| | 11/14/2017 | 781,274 | $32.74 | $25,576,957.58 |
| | 11/20/2017 | 8,774,328 | $32.74 | $287,249,562.90 |
| | 11/20/2017 | 1,186,023 | $32.74 | $38,827,427.96 |
| | 11/20/2017 | 232,108 | $32.74 | $7,598,635.65 |
| | 11/20/2017 | 117,582 | $32.74 | $3,849,340.73 |
| | 11/20/2017 | 111,887 | $32.74 | $3,662,900.66 |
| | 11/20/2017 | 3,278,727 | $32.74 | $107,337,325.16 |
| | 11/20/2017 | 145,173 | $32.74 | $4,752,601.09 |
| | 11/20/2017 | 28,250 | $32.74 | $924,834.38 |
| | 11/20/2017 | 337,658 | $32.74 | $11,054,078.78 |
| | | **57,014,784** | **Total (Sales)** | **$1,746,671,635.47** |
| | | | | |
| **HACHIGIAN** | 5/31/2017 | 298,375 | $29.67 | $8,852,786.25 |
| | 11/20/2017 | 156,029 | $32.74 | $5,108,389.46 |
| | | **454,404** | **Total (Sales)** | **$13,961,175.71** |
| | | | | |
| | | | | |
| | | **57,499,188** | **Total (Sales)** | **$1,760,632,811.18** |

## IX. INVESTORS LEARN ABOUT THE BOARD'S MISCONDUCT THROUGH THE OCTOBER 2018 MEMORANDUM OPINION

### A. The October 5, 2018 Eastern District of Virginia Memorandum Opinion

133. On October 5, 2018, the Eastern District of Virginia court issued its memorandum opinion detailing JELD-WEN's anticompetitive conduct and ordering the divestiture of the Towanda, Pennsylvania, plant. Here the court found JELD-WEN increased prices despite falling costs and reduced reimbursements for defective doorskins.

134. As a result of the ruling, several analysts lowered their price target on JELD-WEN stock over the ensuing trading days. For example, on October 8, 2018, an RBC Capital Markets report quantified the operational impact of the divestiture of CMI and reported that JELD-WEN would lose up to 33% of its global doorskins capacity as a result. The Company's stock price dropped over 11%, falling from $24.09 per share on October 5, 2018, to $21.35 per share on October 12, 2018, and erasing $287 million in market capitalization.

### B. The October 15, 2018 Press Release

135. Finally, on October 15, 2018, the Company issued a press release admitting for the first time that it would likely face a significant judgment in the Steves litigation, despite previously claiming the Steves litigation was meritless. The press release announced a charge of $76.5 million for a "litigation contingency" relating to the Steves litigation, as the recent rulings "now provided sufficient detail for the [C]ompany to estimate future liabilities." In a separate press release issued that same day, the Company disclosed defendant Mallard's resignation as JELD-WEN's CFO.

136. On this news, JELD-WEN's market capitalization plunged 18.9%, or $4.03 per share, on October 16, 2018, to close at $17.28 per share compared to the previous trading day's closing of $21.31 per share, erasing almost $422.8 million in market capitalization in a single day.

## X. THE INDIVIDUAL DEFENDANTS CAUSED JELD-WEN TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

137. In breach of their fiduciary duties to JELD-WEN, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, the Director Defendants caused or approved of the Company's repurchase of over 3.5 million shares of its stock at artificially inflated prices.

138. Throughout the relevant period, the Board approved repurchases of the Company's common stock at artificially inflated prices that substantially damaged JELD-WEN. [redacted]

139. In total, the Company spent an aggregate amount of over $95 million to repurchase 3,572,733 shares of its own common stock at artificially inflated prices from April 2018 to October 2018, as shown by the table below:

| Repurchase Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| April 29, 2018 - May 26, 2018 | 1,054,570 | $28.55 | $30,107,974 |

| | | | |
|---|---|---|---|
| May 27, 2018 - June 30, 2018 | 589,347 | $28.65 | $16,884,792 |
| July 29, 2018 - August 25, 2018 | 1,099,849 | $25.49 | $28,035,151 |
| August 26, 2018 - September 29, 2018 | 336,828 | $25.42 | $8,562,168 |
| September 30, 2018 - October 27, 2018 | 492,139 | $23.24 | $11,437,310 |
| **Total** | **3,572,733** | | **$95,027,394** |

140. Through the repurchases, the Director Defendants signaled to the market that they believed JELD-WEN's shares were undervalued and that the repurchases were the best use of the Company's case. Because share repurchases lower the number of outstanding shares, the repurchases also increased the Company's earnings per share, return on equity, return on assets, and other metrics. Collectively, these actions artificially inflated JELD-WEN's share price with each repurchase, and increased the price for each subsequent repurchase.

141. When the truth about the Company's anticompetitive wrongdoing was fully exposed, JELD-WEN's stock price fell to approximately $17.28 per share. As a result, the 3,572,733 shares the Company repurchased between April 2018 and October 2018 for over $95 million were only worth approximately $61,736,826, or only 65%, of what the Company paid for them.

## XI. DAMAGES TO JELD-WEN

142. As a result of the Individual Defendants' improprieties, JELD-WEN disseminated improper, public statements concerning anticompetitive conduct. These improper statements have devastated JELD-WEN's credibility as reflected by JELD-WEN's $3.6 billion, or 83.2%, market capitalization loss to date.

143. JELD-WEN's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, JELD-WEN's current and potential customers consider a company's ability to accurately value its business prospects and comply with

the law. Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions and violate antitrust laws. JELD-WEN's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, JELD-WEN stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to JELD-WEN.

144. Further, as a direct and proximate result of the Individual Defendants' actions, JELD-WEN has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the Steves litigation;

(b) costs incurred from defending and paying the settlements in the class actions for violations of federal antitrust laws;

(c) costs incurred from defending and paying the settlement in the class actions for violations of federal securities laws;

(d) excessive sums paid to repurchase the Company's stock at inflated prices; and

(e) costs incurred to investigate wrongdoing.

145. In addition, since the Insider Selling Defendants utilized the Company's nonpublic information to sell their stock, they must disgorge any profits from these sales back to JELD-WEN.

## XII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146. Plaintiffs bring this action derivatively in the right and for the benefit of JELD-WEN to redress injuries suffered, and to be suffered, by JELD-WEN as a direct result of the breach of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the

Individual Defendants. JELD-WEN is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147. Plaintiffs will adequately and fairly represent the interests of JELD-WEN in enforcing and prosecuting its rights.

148. Plaintiffs were stockholders of JELD-WEN at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current JELD-WEN stockholders.

149. The current Board of JELD-WEN consists of the following twelve individuals: defendants Michel, Ross, Wendt, Munk, Wynne, Taten, Stefany, Banholzer, and Maxwell, and nondefendants Tracey I. Joubert ("Joubert"), Cynthia Marshall ("Marshall"), and David G. Nord ("Nord"). Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A. Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

150. [redacted]

[redacted]

151. As alleged above, defendants Michel, Ross, Wendt, Munk, Wynne, Taten, Stefany, Banholzer, and Maxwell breached their fiduciary duties of loyalty by making improper statements in JELD-WEN's press releases and SEC filings regarding intentionally anticompetitive conduct that violated federal antitrust law. In particular, defendants Ross, Wendt, Munk, Wynne, Taten, and Maxwell each signed the misleading 2016 Form 10-K. [redacted]

152. [redacted] The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, these defendants were responsible for knowingly or recklessly allowing the improper statements related to JELD-WEN's earnings guidance and financial and disclosure controls. Moreover, defendants Maxwell, Stefany, and Wynne reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, defendants Maxwell, Stefany, and Wynne caused these improper statements. Accordingly, defendants Maxwell, Stefany, and Wynne breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, defendants

Maxwell, Stefany, and Wynne face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

153. [redacted]

154. **Defendant Ross** cannot conduct an independent and objective investigation into the wrongful conduct described herein because he lacks independence from defendant Onex, a controlling stockholder and an Insider Selling Defendant. [redacted] Defendant Ross will not vote to initiate litigation against the company that employs him. Demand is futile as to defendant Ross.

155. **Defendant Munk** similarly cannot conduct an independent and objective investigation into the wrongful conduct described herein because he lacks independence from defendant Onex. [redacted] Defendant Munk will not vote to initiate litigation against the company that employs him. Demand is futile as to defendant Munk.

156. The principal professional occupation of **defendant Michel** is his employment with JELD-WEN, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Michel lacks independence from defendants Ross, Wendt, Munk, Wynne, Taten, Stefany, Banholzer, and Maxwell, and nondefendants Joubert, Marshall, and Nord due to his interest in maintaining his executive position at JELD-WEN. This lack of independence renders defendant Michel incapable

of impartially considering a demand to commence and vigorously prosecute this action. JELD-WEN paid defendant Michel the following compensation:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $444,231 | $1,212,500 | $4,967,005 | $1,999,287 | $58,497 | $8,681,520 |

Accordingly, defendant Michel is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Michel.

## XIII. DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Fiduciary Duties

157. By reason of their positions as officers and directors of JELD-WEN, each of the Individual Defendants owed and owe JELD-WEN and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage JELD-WEN in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of JELD-WEN and not in furtherance of their personal interest or benefit.

158. To discharge their duties, the officers and directors of JELD-WEN were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of JELD-WEN. By virtue of such duties, the officers and directors of JELD-WEN were required to, among other things:

(a) properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal

controls of the Company at any given time, including making accurate statements about the Company's business practices;

(b) refrain from selling JELD-WEN stock on the basis of nonpublic insider information;

(c) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(d) conduct the affairs of JELD-WEN in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting JELD-WEN's assets, and to maximize the value of JELD-WEN's stock; and

(e) remain informed as to how JELD-WEN conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

159. JELD-WEN holds its fiduciaries to specific corporate governance principles beyond the requirements of law. In particular, in the Company's Guidelines on Corporate Governance Matters, JELD-WEN describes the duties to be undertaken by the Board and the active oversight role the Board plays in the Company's business affairs. In particular, the Guidelines on Corporate Governance Matters state that "[t]he Board's role is to oversee the management and governance of the Company and to ensure that the long-term interests of stockholders are being served."

160. The Individual Defendants, as directors and officers of JELD-WEN, were also bound by the Company's Code. The Code sets out basic principles to guide all directors, officers, and employees of JELD-WEN, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior. With respect to the Company's compliance with laws, rules, and regulations, the Code states, "[a]ll directors, officers and employees must respect and comply with applicable laws, rules and regulations of all global locations where the Company conducts its business."

161. With respect to JELD-WEN's directors, officers, and employees compliance with antitrust laws, the Code provides:

> **Antitrust Laws**
>
> Business activities must be conducted in accordance with applicable antitrust and competition laws. Some of the most serious antitrust offenses are agreements between competitors that limit independent judgment and restrain trade, such as agreements to fix pricing, or to divide a market for customers, territories, products or purchases. Any communication with a competitor's representative, no matter how innocent it may seem at the time, may later be subject to legal scrutiny and form the basis for accusations of improper or illegal conduct. Directors, officers and employees should avoid situations from which an unlawful agreement could be inferred. By bringing competitors together, trade associations can raise antitrust concerns, even though such groups serve many legitimate goals. The exchange of sensitive information with competitors regarding topics such as pricing or billing practices can potentially violate antitrust and competition laws and should be avoided.
>
> ***Potential Red Flags:***
>
> • Discussing, communicating (including at industry meetings or in surveys), proposing or entering into any agreements or understandings—express or implied, formal or informal, written or oral—with any competitor regarding:
>
> - pricing;
> - terms or conditions of sale;
> - wages, compensation or benefits information;

- costs, profits or profit margins;
- product or service offerings
- production, sales capacity or volume;
- market share;
- coordination of bidding activities; or
- dividing sales territories or allocation of customers or product lines.

• Exclusive arrangements for the purchase or sale of products or services.

• Bundling of goods and services

• Agreements that restrict a customer's choices in using or reselling a JELD-WEN product or service.

• Technology licensing agreements that restrict the freedom of the licensee or licensor.

• Selective price discounting to only certain customers.

• Distribution arrangements with competitors.

The laws governing this area are complex, and employees should seek counsel from the Law Department whenever appropriate. In particular, the Law Department should be consulted early in the process of evaluating any proposed merger, acquisition or joint venture. The Law Department should also be consulted in connection with business arrangements that could raise any red flags, including exclusive arrangements for the purchase or sale of products or services and bundling of goods and services.

162. With respect to the Company's directors, officers, and employees' commitment to ensure JELD-WEN's financial integrity and accurate records, the Code provides:

**Financial Records and Reports**

The Company's books, records, accounts and financial statements must accurately and fairly reflect the assets, liabilities, revenues and expenses of the Company, and conform to applicable legal requirements and accounting standards. Employees may not make any false statements, misleading or artificial entries, or material omissions or misrepresentations in any of the Company's books, financial records, or other documents or communications. All financial transactions must be

accurately documented in reasonable detail and recorded in the Company's accounting records. Accruals shall be supported by appropriate documentation and based upon good faith estimates.

**Accounting Controls**

The Company has policies, procedures and practices in place to ensure that adequate internal controls exist over financial reporting, assets are properly safeguarded, transactions are properly authorized, transactions are properly recorded and reported and financial reporting is accurate and complete. All entities worldwide are required to use the Company's standard internal reporting formats, month end dates and universal chart of accounts unless prohibited by local laws. In addition, all reporting units and corporate locations must have internal controls that continually operate effectively to ensure the Company's financial management objectives are achieved.

**Financial Disclosures**

Disclosures made in the Company's public communications and communications with investors must be complete, fair, accurate, timely and understandable. All employees who are involved in the Company's disclosure process, including all senior financial personnel and all employees with supervisory responsibilities with respect to the Company's public disclosure documents, are expected to act in furtherance of this requirement. In particular, these individuals are required to be familiar with and to comply with all applicable disclosure requirements and are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, whether inside or outside the Company.

Directors, officers and employees should be aware of the Company's procedures for developing and making public disclosure and avoiding inadvertent or selective disclosure to analysts or others contained in the Policies.

163. The Code also prohibits insider trading. In particular, the Code states:

**Insider Trading**

Directors, officers and employees are prohibited from directly or indirectly trading securities of a public company on the basis of material, non-public information. Passing such material, nonpublic information on to someone who may buy or sell securities is known as "tipping," and is also illegal. The prohibition applies to securities of JELD-WEN and securities of other companies as well, including suppliers, customers and other companies that directors, officers or employees may obtain information about in the course of their duties. Non-public information should not be disclosed to anyone, including co-workers, unless the person

receiving the information has a legitimate need to know the information for purposes of carrying out the Company's business.

## B. Additional Duties of the Audit Committee Defendants

164. In addition to these duties, under its Audit Committee Charter, the Audit Committee Defendants, defendants Banholzer, Byorum, Maxwell, Stefany, Tolbert, and Wynne, owed specific duties to JELD-WEN to assist the Board in overseeing the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements, among other things. In particular, the Audit Committee Charter states:

> **Purpose**
>
> The Audit Committee (the "Committee") is appointed by the Board of Directors (the "Board") of JELD-WEN Holding, Inc. (the "Company") to carry out the duties and responsibilities assigned to the Audit Committee under applicable securities laws and the rules and regulations of the New York Stock Exchange ("NYSE"). The Committee shall assist the Board in monitoring the:
>
> - Quality and integrity of the Company's financial statements, including its accounting policies and financial reporting and disclosure practices;
> - Adequacy of the system of internal controls within the Company to support the financial and business environment;
> - Independence, qualifications and performance of the Company's independent auditor;
> - Performance of the Company's internal audit function; and
> - Company's compliance with all applicable legal and regulatory requirements.
>
> In carrying out its responsibilities, the guiding principles to be considered by the Audit Committee include:
>
> - Whether the financial statements fairly present the results of operations of the Company in accordance with generally accepted accounting principles;
> - Whether the treatment of a particular matter is consistent with the Company's practices in prior accounting periods;

- Whether the presentation of a particular matter is reasonably comprehensive under the circumstances;

- Whether the disclosure regarding a particular matter contains any material misstatement or fails to disclose a matter which reasonably would be considered material to the Company's stockholders; and

- Whether the presentation modifies principles of convention or conservatism.

**C. Breaches of Duties**

165. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of JELD-WEN, the absence of good faith on their part, and a reckless disregard for their duties to JELD-WEN that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to JELD-WEN.

166. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, JELD-WEN to engage in an anticompetitive scheme in violation of federal antitrust laws and make improper statements to the public, improper practices that wasted JELD-WEN's assets, and caused JELD-WEN to incur substantial damage.

167. The Individual Defendants, because of their positions of control and authority as officers and/or directors of JELD-WEN, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage JELD-WEN has already incurred, JELD-WEN has expended, and will continue to expend, significant sums of money.

**COUNT I**
**Against the Individual Defendants for Breach of Fiduciary Duty**

168. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

169. The Individual Defendants owed and owe JELD-WEN fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe JELD-WEN the highest obligation of care and loyalty.

170. The Individual Defendants and each of them, violated and breached their fiduciary duties.

171. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) JELD-WEN was engaging in anticompetitive conduct by scheming to consolidate market share and eliminate the competition for interior molded doors and doorskins; (ii) JELD-WEN was engaging in unfair competition by conspiring with Masonite to raise the prices of doorskins and interior molded doors; and (iii) as a result of the foregoing, the Individual Defendants' representations concerning the Company's business operations and financial success, including JELD-WEN's "highly competitive" environment, pricing strategy, product quality, and anticompetitive conduct, were improper when made. Accordingly, the Officer Defendants breached their duty of care and loyalty to JELD-WEN.

172. The Director Defendants, as directors of JELD-WEN, owed JELD-WEN the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning business operations and financials, and authorizing the repurchases of JELD-WEN stock at artificially inflated prices. The Director Defendants knew or were reckless in not knowing that: (i) JELD-WEN was engaging in anticompetitive conduct by

scheming to consolidate market share and eliminate the competition for interior molded doors and doorskins; (ii) JELD-WEN was engaging in unfair competition by conspiring with Masonite to raise the prices of doorskins and interior molded doors; and (iii) as a result of the foregoing, the Individual Defendants' representations concerning the Company's business operations and financial success, including JELD-WEN's "highly competitive" environment, pricing strategy, product quality, and anticompetitive conduct, were improper when made. Accordingly, these defendants breached their duty of loyalty to JELD-WEN.

173. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

174. The Insider Selling Defendants breached their duty of loyalty by selling JELD-WEN stock on the basis of the knowledge of the improper information described above before that information was revealed to JELD-WEN's stockholders. The information described above was material, nonpublic information concerning JELD-WEN's future business prospects. It was a proprietary asset belonging to JELD-WEN's, which the Insider Selling Defendants used for their own benefit when they sold JELD-WEN common stock.

175. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, JELD-WEN has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to JELD-WEN.

176. Plaintiffs, on behalf of JELD-WEN, have no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Misuse of Corporate Information for Personal Inside Trading Profits and for Unjust Enrichment**

177. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

178. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of JELD-WEN. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to JELD-WEN.

179. The Insider Selling Defendants sold JELD-WEN stock while in possession of material, nonpublic information that artificially inflated the price of JELD-WEN stock. As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

180. Plaintiffs, as stockholders and representatives of JELD-WEN, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

181. Plaintiffs, on behalf of JELD-WEN, have no adequate remedy at law.

**COUNT III**
**Against Onex for Breach of Fiduciary Duty**

182. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

183. Onex was and is JELD-WEN's controlling stockholder. Onex has been and remains JELD-WEN's largest stockholder holding 31.9% of Company common stock, giving

Onex control over the Board. Indeed, a majority of the board including Defendants Michel, Ross, Wendt, Munk, Wynne, Taten, Beck, Hachigian, and Mallard were beholden to Onex, highlighting Onex's control over JELD-WEN. Further Onex owns this large stake even after selling around $1.7 billion in Company common stock. Before these sales Onex held a vast majority of the vote, holding roughly 84% of common stock in late 2016. Thus, Onex is JELD-WEN's controlling stockholder, owing the Company fiduciary duties.

184. As the controlling stockholder Onex owed and owes fiduciary obligations to JELD-WEN. By reason of their fiduciary relationships, the Individual Defendants owed and owe JELD-WEN the highest obligation of care and loyalty.

185. Onex violated and breached their fiduciary duties.

186. At all relevant times Onex had the power to control, influence, and cause JELD-WEN and used that power to capture monopolistic profits at the long-term expense of stockholders. As a result of this Onex was able to sell **over $1.7 billion** in common stock.

187. As a direct and proximate result of Onex's breaches of their fiduciary obligations, JELD-WEN has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, Onyx is liable to JELD-WEN.

188. Plaintiffs, on behalf of JELD-WEN, have no adequate remedy at law.

**COUNT IV**
**Against Onex for Unjust Enrichment**

189. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

190. By its wrongful acts, Onex was unjustly enriched at the expense of and to the detriment of JELD-WEN. Onex unjustly enriched itself by selling $1.7 billion in JELD-WEN common stock, inflated as a result of anti-competitive practices.

191. Plaintiffs, as stockholders and representatives of JELD-WEN, seek restitution from Onex, and seek an order of this Court disgorging all profits and benefits obtained by Onex from its wrongful conduct and fiduciary breaches.

192. Plaintiffs, on behalf of JELD-WEN, have no adequate remedy at law.

## XIV. PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of JELD-WEN, demand judgment as follows:

A. Against all of the defendants and in favor of JELD-WEN for the amount of damages sustained by JELD-WEN as a result of the defendants' violations of federal law, breaches of fiduciary duties, and unjust enrichment;

B. Directing JELD-WEN to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect JELD-WEN and its stockholders from a repeat of the damaging events described herein;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of JELD-WEN have an effective remedy;

D. Awarding to JELD-WEN restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E. Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**XIX. JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: June 21, 2021

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Gregory V. Varallo*
Gregory Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
Facsimile: (302) 364-3610
E-mail: greg.varallo@blbglaw.com

*Attorneys for Plaintiffs*

OF COUNSEL

**ROBBINS LLP**
Brian J. Robbins
Gregory E. Del Gaizo
Matias Montillano
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
gdelgaizo@robbinsllp.com
mmontillano@robbinsllp.com